Filed 8/23/23  WVJP 2018-3 LP v. SR Capital CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| WVJP 2018-3 LP, | B317658 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. 21STCV06658 |
| v. | |
| SR CAPITAL LLC et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael L. Stern, Judge. Affirmed.

Aires Law Firm, Timothy Carl Aires for Plaintiff and Appellant.

The Wagner Firm, Avi N. Wagner, Charissa Morningstar, and Jennifer N. Hinds for Defendants and Respondents.

## INTRODUCTION

Plaintiff and appellant WVJP 2018-3 LP (plaintiff), an assignee of a judgment against Robert Rechnitz, appeals from a judgment of dismissal entered after the trial court sustained without leave to amend the demurrer jointly filed by defendants and respondents Shlomo Rechnitz[1] and SR Capital LLC (SR Capital) (together, the SR defendants). Plaintiff claimed that Shlomo, through SR Capital, of which Shlomo is the sole owner and manager, transferred funds belonging to Robert to a bank account intended to hold the money beyond the reach of Robert's creditors. In its second amended complaint (SAC), plaintiff asserted a cause of action for conspiracy to hinder, delay, or defraud creditors. The court sustained the SR defendants' demurrer on the ground that plaintiff had inadequately pleaded facts supporting that Robert had any interest in the money transferred by the SR defendants and denied plaintiff leave to further amend.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is an assignee of a $787,919.17 judgment against Robert. Before filing this lawsuit, plaintiff examined Shlomo, Robert's nephew, in connection with the action in which the judgment was entered against Robert. Shlomo also produced documents in response to a subpoena served on him by plaintiff.

---

[1] Shlomo Rechnitz's first name is also spelled as Schlomo in the appellate record. We use Shlomo in this opinion. Because Robert and Shlomo share a last name, we refer to them by their first names. No disrespect is intended.

Plaintiff filed its original complaint against the SR defendants, Marlene Springer Savage, Stanley Treitel, and Robert in February 2021. The complaint asserted one cause of action for conspiracy to hinder, delay, and defraud creditors. The court sustained a demurrer filed by the SR defendants but granted plaintiff leave to file a first amended complaint, following plaintiff's representation that it had obtained "records . . . pertaining to the [HWP Account], as well as evidence from other sources" that would permit it to sufficiently allege a claim. In May 2021, plaintiff filed its first amended complaint. The SR defendants again demurred, arguing that the first amended complaint, like the original complaint, failed to allege any fraudulent transfer by Robert, any injury suffered by plaintiff, or the elements of a civil conspiracy as to the SR defendants. Plaintiff again contended that, if the demurrer were sustained, leave to amend should be granted because it had "obtained various records . . . pertaining to the [HWP account], as well as evidence from other sources" and thus "ha[d] access to ample facts sufficient to allege a common law tort arising out of [a] scheme to hinder, delay, or defraud creditors." The court sustained the demurrer to the first amended complaint but again granted plaintiff leave to amend.

In September 2021, plaintiff filed the SAC, the operative complaint on appeal. The SAC alleges that plaintiff is an assignee to a judgment creditor and has a claim against Robert, as debtor, based upon a civil judgment entered in August 2016 and amended in December 2016 in the Los Angeles Superior Court, in the sum of $787,919.17, with interest accruing at the rate of $215.81 per day. Robert is the uncle of Shlomo, who is the only

3

officer, director, member, and manager with any actual or real authority over SR Capital.

In September 2016, Treitel and Savage (together, the HWP defendants) opened a checking account under the fictitious name Highland Wilshire Properties (the HWP account). The SAC alleges that, by the express agreement of the defendants, the purpose of the account was "to hold money in which [Robert] had an interest beyond the reach of his creditors in order to pay his personal expenses from time to time at his special instance and request." After the HWP account was opened, the HWP defendants, acting at Robert's direction, "received money in which [Robert] had an interest from entities controlled by [Shlomo], including, without limitation, [SR Capital]," and then used these funds to pay Robert's personal expenses. The HWP account was intended by the defendants to permit Robert "to use and enjoy money in which he had an interest while at the same time avoiding execution levy by Plaintiff . . . since the HWP [a]ccount was not a deposit account standing in the name of [Robert]," and in fact permitted him to do so.

The SAC alleges that, between December 2016 and November 2020, SR Capital transferred over $1.5 million to the HWP account via 66 transactions in amounts ranging from $5,000 to $250,000. The day before each of the transfers was made, Robert and Shlomo "agreed that [SR Capital] would transfer [the relevant amount] of [Robert's] money, which [SR Capital] held for his benefit with the knowledge and consent of its Manager, [Shlomo], to the HWP Account . . . for the express purpose of aiding [Robert] in an effort to hinder, delay, or defraud his creditors." The SR defendants had notice of the pendency of the judgment no later than October 22, 2019, by virtue of a Code

4

of Civil Procedure section 708.120 examination order and civil subpoena duces tecum, but nevertheless continued to participate in the alleged conspiracy.

The SAC further alleges that, between January and November 2020, approximately $166,000 was withdrawn from the HWP account, via 237 transactions in amounts ranging from $3.14 to $9,620.75, for Robert's benefit. Among other things, the withdrawals went towards medical care, credit card bills, utilities bills, and insurance payments. Certain withdrawals also went to individuals, including Savage and others not named in this action, while others were made in cash.

The SAC alleges that the money laundering scheme does not have any indicia of a bona fide loan or series of loans because there is no promissory note or other instrument evidencing a promise to repay, no interest has been charged, no fixed schedule of repayments has been established, no collateral was given, no repayments have been made, Robert has no reasonable prospect of repaying any loans, and the parties have not conducted themselves as if the transactions were loans. It further alleges that the transactions were not gifts because, at his September 22, 2019, examination, Shlomo acknowledged that they were not gifts.[2]

---

[2] The SAC alleges that Shlomo also carries a $240,000 payment made in December 2019 to the Correction Officers' Benevolent Association, Inc. on the books of YTR Capital LLC, an entity he dominates and controls, "as a loan receivable due and payable by [Robert] even though any such payment to Correction officers' Benevolent Association Inc. provided no reasonably equivalent value to [Robert]." It contends that this "was more probably than not another money laundering scheme" designed by Robert and Shlomo to benefit Robert's son, Jona, in connection with a criminal restitution order against Jona in the

The SAC does not plead facts explaining how Robert had an interest in or right to the money held by SR Capital and subsequently transferred to the HWP account, notwithstanding that Shlomo was the sole owner and manager of SR Capital.[3]

The SAC asserts four causes of action: (1) damages for conspiracy to hinder, delay, or defraud creditors against all defendants; (2) "Relief Against Fraudulent Transactions Under the Uniform Voidable Transactions Act, Civil Code §3439 et seq." (UVTA) against all defendants; (3) "Creditor's Suit in Aid of Enforcement of Judgment Under Code of Civil Procedure §708.210 et seq." against the SR defendants; and (4) "Quia Timet [Constructive Trust, Equitable Lien, Resulting Trust, Injunction, Appointment Of Monitor]" against the SR defendants and Robert.

With respect to the first cause of action for conspiracy to defraud, plaintiff alleges: "Even assuming, without admission, that the money transferred through the Money Laundering Scheme was property of someone other than Defendant Robert Rechnitz before those transfers were made, once the money transfers were made, the money became the property exclusively of Defendant Robert Rechnitz since it was held in the HWP

_____

Southern District of New York. Plaintiff does not appear to allege that this transaction was part of the conspiracy alleged against the SR defendants in this action.

[3] The original complaint and first amended complaint do not contain the allegation that the money transferred by SR Capital to the HWP account was Robert's. Rather, both complaints alleged that, even if the money belonged to someone else before it was transferred to the HWP account, it became Robert's property after the transfers were made because it was held in the HWP Account exclusively for his use and benefit.

6

Account exclusively for his use and benefit." The SAC further alleges that, but for the defendants' actions, "the money in the HWP Account would have been subject to execution levy using traditional methods of judgment enforcement."

The SR defendants again demurred, arguing that the SAC did not remedy the failures of the prior complaints with respect to the first cause of action and that the additional causes of action impermissibly exceed the scope of the court's order granting leave to amend. Plaintiff argued that, if the demurrer was sustained, it should be given leave to amend the complaint a third time. However, plaintiff did not identify any new facts that would permit it to plead any of the causes of action asserted.

While the demurrer was pending, plaintiff filed a motion seeking leave to file a third amended complaint. The motion did not allege any new facts, but included the three causes of action that had been added to the SAC without prior leave of court and added a cause of action for "[a]ccounting." Plaintiff argued that these causes of action arose out of the same common nucleus of operative facts pleaded in the SAC and would "address this Court's concerns regarding lack of particularity in pleading, together with additional prayers for relief."

Several days later, the court issued its order sustaining the SR defendants' demurrer to the SAC. The court found that, although plaintiff alleged "numerous instances of money going out of the HWP account, by date, payee (credit card company, utility company etc.) and amount from January 2020 to December 2020" and " 'an express agreement to use the account for Robert,' " plaintiff did not attach any writing substantiating any such agreement to the complaint. The court further found that "there continue to be inadequately pleaded facts how Robert

'had an interest' in the money that was placed in [the HWP] account" and that plaintiff continued to fail to properly plead a cause of action against the SR defendants for conspiracy to defraud. The court noted that it "had admonished plaintiff not to amend the Complaint to supplement with additional causes of action without obtaining leave of court" and that plaintiff had failed to seek any such leave before adding the other causes of action. The court dismissed all claims against the SR defendants with prejudice.

In the order of dismissal, the court indicated that it was dismissing the action with prejudice as to "SR Capital LLC, et al." but did not indicate that it was dismissing the entire action.

Plaintiff timely appealed.

## DISCUSSION

Plaintiff contends that the court erred in sustaining the demurrer on several grounds. Plaintiff first argues that the court incorrectly required that its conspiracy to hinder, delay, or defraud cause of action be pleaded with particularity, as the cause of action does not sound in traditional fraud and deceit. Plaintiff also asserts that the court erred in holding that the absence of a written agreement evidencing the alleged conspiracy rendered the SAC insufficient.

Plaintiff contends that leave to amend should have been granted and identifies purportedly new facts that it contends adequately state a claim. Plaintiff further asserts that the allegations of the SAC and the new facts identified in its briefing support the theories of liability alleged without leave of court in the SAC and a civil cause of action under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et seq.) (RICO).

8

Finally, plaintiff argues that, even if we otherwise affirm, we should remand the matter with directions to correct the judgment of dismissal, which plaintiff contends is unclear as to which parties were dismissed.

For the reasons discussed herein, we affirm the court's order sustaining the demurrer without leave to amend and decline to remand the matter with instructions to correct the judgment.

## 1. Standards of Review

We independently review a trial court's order sustaining a demurrer to determine whether the operative complaint alleges facts sufficient to state a cause of action. (*Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 725.) We assume the truth of all properly pled factual allegations and matters that are judicially noticeable. (*Ibid*.) "An order sustaining a demurrer without leave to amend may be affirmed on any ground stated in the demurrer, even if the trial court did not act on that ground." (*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2019) 42 Cal.App.5th 918, 934.)

When a demurrer is sustained without leave to amend, we decide whether there is a reasonable possibility that the plaintiffs can amend their complaint to cure the defect. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) If the defect can be cured, "the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Ibid*.) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Ibid*.)

2. **The court properly sustained the demurrer to the SAC.**

 2.1. **Plaintiff's conspiracy to hinder, delay, or defraud cause of action sounded in fraud and was required to be pleaded with particularity.**

Plaintiff concedes that, "[o]f course, where fraud and deceit is alleged to be the object of a conspiracy, the claim must be pleaded with particularity," but contends that "neither conspiracy to hinder, delay, or *defraud* creditors nor the tort of aiding and abetting a debtor in *concealing* their assets sound in traditional fraud and deceit."[4] (Italics added.) We disagree.

" '[I]n California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] "Thus ' "the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect." ' [Citation.] [¶] This particularity requirement necessitates pleading facts which 'show how, when, where, to whom, and by what means the representations were tendered.' " ' [Citation.]" (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 993.) Similarly, "[c]oncealment is a species of fraud, and . . . 'must be pleaded with specificity.' [Citation.]" (*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 878.)

"[I]t is well settled that 'there is *no separate tort* of civil conspiracy, and there is *no civil action* for conspiracy to commit a recognized tort unless the *wrongful act* itself is committed and damage results therefrom.' [Citations.]" (*Kerr v. Rose* (1990) 216

---

[4] As the SR defendants note, no cause of action for aiding and abetting a debtor in concealing assets was pleaded in the SAC.

Cal.App.3d 1551, 1564.) In *Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1016, the plaintiff asserted "conspiracy to defraud" as its first cause of action. The court concluded that the cause of action was "mislabeled." (*Ibid.*, fn. 11.) " 'Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration.' [Citation.] The cause of action here is for fraud." (*Ibid.*)

Courts have long held that a conspiracy to defraud must be pleaded with particularity. (See *Ross v. New Amsterdam Casualty Co.* (1922) 56 Cal.App. 254, 258 [demurrer properly sustained where complaint fell "far short of alleging a conspiracy to defraud the plaintiff entered into between the defendant[s] . . . and entirely fails to measure up to that degree of particularity requisite in actions for damages for fraud and deceit"]; *Favila v. Katten Muchin Rosenman LLP* (2010) 188 Cal.App.4th 189, 211 ["because fraud was the object of the conspiracy alleged . . . the claim must be pleaded with specificity"]; *Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1136 ["Where fraud is alleged to be the object of the conspiracy, the claim must be pleaded with particularity."].)

Neither *Aghaian v. Minassian* (2020) 59 Cal.App.5th 447 (*Aghaian*) nor *Taylor v. S & M Lamp Co.* (1961) 190 Cal.App.2d 700 (*Taylor*) support plaintiff's assertion that a cause of action for conspiracy to hinder, delay, or defraud creditors does not sound in traditional fraud and deceit and does not need to be pleaded with particularity.

In *Aghaian*, the plaintiffs, beneficiaries of a trust, sued the defendants, Shahen, Alice and Arthur, in connection with

11

Shahen's management of the trust properties. (*Aghaian, supra*, 59 Cal.App.5th at p. 452.) Shahen and Alice had been married for over 50 years and owned two homes as joint tenants. (*Ibid*.) The plaintiffs alleged that Shahen, Alice, and their son, Arthur, who was also their attorney, " 'concocted' a 'scheme . . . to hinder, delay or defraud Shahen's creditors, particularly [the] [p]laintiffs, by putting [the couple's] two houses . . . into Alice's name only, and thereby making it more difficult for [the p]laintiffs to levy on them.' " (*Ibid*.) In furtherance of this scheme, Shahen and Alice filed a fraudulent petition for marital dissolution even though they had never separated, and, with Arthur acting as Shahen's guardian ad litem, stipulated to a judgment in the dissolution action under which ownership of the houses was awarded to Alice, and Shahen was assigned the obligation to pay any judgment that might thereafter be entered in the plaintiffs' pending lawsuit. (*Id*. at pp. 452–453.)

On appeal, the court concluded that the plaintiffs had adequately pleaded that "Shahen made the subject transfers with ' "an actual intent to hinder, delay or defraud any creditor of the debtor," ' within the meaning of the UVTA, and alleged *with particularity* the existence of several badges of fraud: Shahen made the transfers to an 'insider[]' . . . ; he 'retained control of the two properties after the transfers'; the plaintiffs had sued Shahen before he made the transfers; and Shahen 'did not receive reasonabl[y] equivalent value . . . for his transfer of the two properties.' " (*Aghaian, supra*, 59 Cal.App.5th at p. 456, italics added.) With respect to the cause of action for aiding and abetting Shahen's fraudulent transfer asserted against Arthur, the court noted that the "plaintiffs alleged that Arthur 'provided substantial assistance to Shahen and Alice in order to hinder,

12

delay and defraud Shahen's creditors, including [p]laintiffs,' " including by " 'orchestrat[ing] the "divorce strategy" which he knew was a sham' " and " 'sign[ing] the quitclaim deeds as Shahen's "attorney-in-fact" to transfer title of the [Sherman Oaks properties] to Alice,' " and concluded that these allegations were "sufficient to state a cause of action for aiding and abetting a fraudulent transfer." (*Id.* at p. 459.)

The *Aghaian* court did not expressly state that a cause of action for aiding and abetting fraud must be pleaded with particularity. However, as with a conspiracy to defraud, "there can be no aiding and abetting liability absent the commission of an underlying tort." (*Nasrawi v. Buck Consultants LLC* (2014) 231 Cal.App.4th 328, 343, fn. 7, citing *Richard B. LeVine, Inc. v. Higashi* (2005) 131 Cal.App.4th 566, 574.) Since the court had already concluded that the underlying tort of fraud was pleaded with particularity, it did not need to restate this requirement when considering whether the complaint adequately alleged that Arthur had aided and abetted in that fraud. Thus, *Aghaian* does not persuade us that the fraud underlying a cause of action or conspiracy to defraud need not be pleaded with particularity.

In *Taylor*, the question before the court was whether the complaint, filed in *propria persona*, stated a cause of action. (*Taylor*, *supra*, 190 Cal.App.2d at p. 703.) The complaint sought damages for conversion of personal property belonging to plaintiff and alleged that the defendant removed the locks from the plaintiff's business, "caused the equipment, supplies, books and records of [plaintiff's business] to be removed from the premises, and has refused to account to plaintiff for same." (*Id.* at p. 704.) The court observed that " 'no particular form of words is essential in averring a conversion, provided the fact of the conversion is

13

sufficiently stated.' . . . [Citation.]" (*Ibid.*) "The failure of the complaint to use such terms as 'fraud,' 'to defraud creditors,' 'unlawfully,' or 'wrongfully' does not render the pleading defective where, as here, such conduct and intent is implied from the ultimate facts alleged," including that "the removal of the plaintiff's property was carried out 'surreptitiously.' " (*Id.* at p. 705.) The court concluded that the plaintiff had adequately alleged a cause of action for conversion. (*Ibid.*) The court also concluded that the complaint stated a cause of action based on allegations that the defendant had assisted individuals against whom the plaintiff had a judgment in concealing their assets and thus in preventing plaintiff from collecting the judgment. (*Ibid.*) "[A] debtor and those who conspire with him to conceal his assets for the purpose of defrauding creditors are guilty of committing a tort and each is liable in damages." (*Id.* at p. 706.) The *Taylor* court did not discuss the pleading standard for this second cause of action.

Plaintiff relies on the *Taylor* court's discussion of the pleading standard for conversion in arguing that particularity is not required, but does not argue that the SAC asserts a conversion cause of action under a mistaken label. "Conversion is a species of strict liability in which questions of good faith, lack of knowledge and motive are ordinarily immaterial." (*City of Los Angeles v. Superior Court* (1978) 85 Cal.App.3d 143, 149.) "[I]f plaintiff's ownership of the property is properly alleged and there is an averment that the defendant converted the same, a cause of action [for conversion] is sufficiently stated [citation]." "[N]o particular form of words is essential in averring a conversion, provided the fact of the conversion is sufficiently stated . . . ." (*Baird v. Olsheski* (1929) 102 Cal.App. 452, 454.) In contrast,

14

" '[f]raud is an intentional tort' " requiring a knowledge of falsity and intent to defraud. (*Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 85.) Further, in the absence of any express statement by the *Taylor* court that the relaxed pleading standard for conversion also applied to the conspiracy to defraud cause of action, and in light of the many cases holding that a conspiracy to defraud must be pleaded with particularity, we reject plaintiff's contention that *Taylor* supports that it was only required to plead ultimate conclusions in order to state a cause of action for conspiracy to defraud.

In sum, the gravamen of the SAC is that the SR defendants conspired to defraud plaintiff by concealing assets belonging to Robert. The court correctly concluded that plaintiff's cause of action for conspiracy to hinder, delay, or defraud must be pleaded with particularity.

### 2.2. The SAC failed to plead any underlying act of fraud with particularity.

We next consider whether the SAC stated a cause of action for conspiracy to hinder, delay, or defraud with particularity. To adequately plead a claim for civil conspiracy, plaintiffs must plead facts to support three elements: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581.) Here, as discussed, the wrongful act alleged was fraud. " 'The elements of fraud . . . are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e)

15

resulting damage.' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

The SAC alleges that the money that was transferred from SR Capital to the HWP account, which the HWP defendants used to pay for Robert's personal expenses, was Robert's money before any transfer took place, and that the defendants thus conspired to keep money that should have been used to satisfy the judgment out of plaintiff's reach. Alternatively, the SAC alleges that, even if the money was not Robert's before SR Capital transferred it to the HWP account, it belonged to Robert once in that account because the HWP defendants agreed to use it for his sole benefit. We consider whether the SAC adequately alleges fraud under both theories in turn.

### 2.2.1. The SAC fails to plead with particularity that the money transferred from SR Capital to the HWP account belonged to Robert.

As a preliminary matter, the SR defendants contend that the allegation that money transferred from SR Capital to the HWP account was Robert's should be disregarded as a sham pleading. "Under the sham pleading doctrine, plaintiffs are precluded from amending complaints to omit harmful allegations, without explanation, from previous complaints to avoid attacks raised in demurrers or motions for summary judgment. [Citations.] . . . 'Allegations in the original pleading that rendered it vulnerable to demurrer or other attack cannot simply be omitted without explanation in the amended pleading. The policy against sham pleadings requires the pleader to *explain* satisfactorily any such omission.' [Citation.]" (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 425–426, fn. omitted.) The doctrine is not intended to prevent honest complainants from

16

correcting erroneous allegations or to prevent the correction of ambiguous facts, but to enable courts to prevent an abuse of process. (*Id.* at p. 426.)

In the original complaint, plaintiff alleged that, regardless of "the nature of the money transfers . . . before those transfers were made . . . once the money transfers were made the money became the property exclusively of [Robert]." In the operative complaint, plaintiff instead alleges that the transfers from SR Capital consisted "of Defendant Robert Rechnitz's money."

We disagree with the SR defendants' contention that these two allegations are necessarily inconsistent. The original complaint did not appear to affirmatively allege that the funds belonged to someone other than Robert, but that it did not matter what the source of the funds was because they were eventually used for Robert's benefit. Indeed, plaintiff continued to allege in the SAC that, even if the money was not Robert's to begin with, it became his property once it was held in the HWP account for his benefit. Thus, the SAC did not simply remove an unhelpful allegation. The further allegation that the funds transferred to the HWP account belonged to Robert could be characterized as correcting a fact initially left ambiguous.

Nevertheless, we conclude that plaintiff failed to plead any specific facts supporting that the money transferred by SR Capital to the HWP account was Robert's. There are dozens of allegations concerning the circumstances surrounding the transfers from SR Capital to the HWP account, and hundreds concerning how funds in the HWP account were used for Robert's benefit, but there are *none* addressing whether, when, and how Robert transferred funds to SR Capital, the amount of any such transfers, or whether any consideration received by Robert for

17

such transfers was reasonably equivalent to the value of any asset transferred or the amount of the obligation incurred. The allegation that the SR defendants' transfers "greatly reduced" the apparent value of Robert's estate is unsupported by any specific allegations.

Plaintiff argues that it need not allege any fraudulent transfer of Robert's assets to plead a conspiracy to defraud, citing *Taylor*, *supra*, 190 Cal.App.2d at page 705. The *Taylor* court held that a conspiracy to defraud had been adequately alleged where the plaintiff pleaded "a concealment of [the judgment debtors'] assets for the purpose of defrauding their principal creditor." (*Ibid.*) It is possible that plaintiff *could* allege a conspiracy to defraud by pleading the existence of an agreement to conceal the debtor's assets, or to assist the debtor in concealing them. However, plaintiff has pleaded no specific facts supporting that the SR defendants assisted Robert in concealing assets that belonged to him to keep them beyond the reach of his creditors. The term "conceal" does not appear anywhere in the SAC. Further, if the money SR Capital transferred to the HWP account was Robert's, as the SAC repeatedly alleges, the implication is that Robert transferred that money to SR Capital or Shlomo at some earlier point in time. *Taylor* does not relieve plaintiff of the obligation to plead the circumstances of any such transfer.

Plaintiff further alleges and contends that this is a standard "piggy bank" case but fails to address the fundamental differences between the cases on which it relies and the circumstances alleged in the SAC.

In *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 217 (*Curci*), the creditor sought to add a limited liability company (LLC) created by the debtor, a real estate

18

developer, as a judgment debtor. The LLC in question was formed for the sole purpose of holding the debtor's and his wife's cash balances. (*Id.* at p. 218.) The LLC had two members: the debtor, who had a 99 percent member interest, and his wife, who had a 1 percent member interest. (*Ibid.*) Thus, the debtor determined when, if at all, the LLC would make monetary distributions to its members. (*Ibid.*) Two years after forming the LLC, the debtor, in an individual capacity, borrowed $5.5 million from the creditor, to be repaid in full by January 2009. (*Ibid.*) Shortly thereafter, the debtor, through the LLC, settled eight family trusts and loaned a total of approximately $42.6 million to three general partnerships formed for estate planning purposes. (*Ibid.*) When the debtor did not repay the $5.5 million loan, the creditor filed an action and sought judgment, which was entered in the creditor's favor. (*Id.* at p. 219.) Despite having made no payments on the judgment, in 2014, the debtor, as manager of the LLC, chose to execute amendments to the $42.6 million loan to extend the terms by five years without requiring any consideration for the extension. (*Ibid.*) The creditor sought a charging order against the LLC and other business entities in which the debtor had an interest, which was granted in 2014. (*Ibid.*) The creditor received no money as a result of the charging order. (*Ibid.*) Although the LLC had distributed $176 million to the debtor and his wife from 2006 to 2012, no distributions were made since the entry of judgment against the debtor. (*Ibid.*) The creditor therefore sought to make the LLC a judgment debtor under the outside reverse veil piercing doctrine. (*Ibid.*) The *Curci* court concluded that the doctrine was available in the case and remanded to allow the trial court to engage in the required fact-driven analysis in the first instance. (*Id.* at p. 224.)

19

In *In re Hamm* (Bankr. S.D.Fla. 2006) 356 B.R. 263, 267 (*Hamm*), the debtors, a husband and wife, brought an adversary proceeding seeking a determination that their federal income tax liabilities were discharged in their underlying chapter 7 case. The court concluded that the debtors' tax liabilities survived their bankruptcy and could be enforced by the government. (*Ibid*.) As is relevant here, the husband, who was a plastic surgeon, operated his practice as a corporation and later as an LLC, with separate accounts from the debtors' personal accounts. (*Id.* at pp. 273–274.) However, he withdrew an average of $80 per day from his practice's account for personal expenses, such as handymen, parking valets, and cash wires for the debtors' children. (*Id.* at p. 274.) The court "conclude[d] that the [d]ebtors used the business account to the extent of their personal-use withdrawals as a kind of personal piggy bank upon which the Internal Revenue Service could not easily levy." (*Id.* at p. 281.)

Thus, in both *Curci* and *Hamm* (neither of which was decided on a demurrer to a claim of fraud or conspiracy to defraud), the debtors controlled the LLCs they used as piggy banks for personal expenses. Here, the SAC alleges that money held by SR Capital was Robert's money but does not explain how Robert had any interest in or right to funds that were held by a company controlled completely by Shlomo.

Plaintiff also relies heavily on *Nagel v. Westen* (2021) 59 Cal.App.5th 740 (*Nagel*), both for the proposition that the law will not be interpreted in a way that frees up debtors to devise new and more creative ways to circumvent valid obligations and in support of its claim that the court placed too high a pleading burden on plaintiff. *Nagel* concerned a claim brought under the UVTA. (*Id.* at p. 744.) In *Nagel*, the plaintiff purchased a house

from defendants that turned out to have extensive, undisclosed water damage. (*Ibid.*) When it had become apparent that the arbitrator would rule in plaintiff's favor, the defendants designed and implemented an asset protection plan, which included the purchase of a house in Texas, which they improved with the balance of their sale proceeds. (*Id.* at p. 745.) Defendants promptly moved to Texas upon receiving the arbitrator's preliminary award so they could invoke the state's unlimited homestead exemption to shield the new house from creditors. (*Ibid.*) The defendants argued that the plaintiff could not maintain a cause of action for fraudulent transfer without identifying a third party transferee who received their assets and the trial court agreed. (*Id.* at p. 746.)

On appeal, the court concluded that the plaintiff had adequately alleged a transfer under the UVTA where she alleged that defendants "moved their personal belongings and financial assets, including a portion of the . . . sale proceeds, to a foreign jurisdiction" and that "they used the . . . sale proceeds to buy and improve foreign real estate for the purpose of shrinking the corpus of assets available for collection." (*Nagel, supra,* 59 Cal.App.5th at p. 749.) It held that "physically relocating personal property and transmitting or transporting sale proceeds out of state, then transmuting them into a different legal form, may constitute a direct or indirect mode of parting with assets or one's interest in those assets" and that "the UVTA does not limit its enforcement measures to third parties." (*Id.* at pp. 749–750.)

*Nagel* does not assist plaintiff any more than *Curci* or *Hamm*. The issue in *Nagel* was whether transmuting property without transferring it to a third party could support a claim under the UVTA. The plaintiff in *Nagel* alleged that the

21

defendants, upon realizing that the outcome of the arbitration would not be favorable, used the proceeds from the fraudulent sale of their home to the plaintiff and purchased and improved a house in Texas for the express purpose of shielding that money from collection. Here, there are no specific allegations supporting that Robert transferred or transmuted *any* property in order to shield it from his creditors; there is only the conclusory allegation that money held by SR Capital and later transferred to the HWP account belonged to Robert.

Plaintiff contends that its allegations that the transfers made by SR Capital were neither gifts nor bona fide loans was sufficient to plead that the money transferred belonged to Robert. We disagree. As noted, to adequately plead fraud, a plaintiff must allege facts showing " ' " 'how, when, where, to whom, and by what means' " ' " the fraud was committed. (*Robinson Helicopter Co., Inc. v. Dana Corp.*, *supra,* 34 Cal.4th at p. 993.) Allegations that the transfers from SR Capital were not gifts or bona fide loans to Robert are not an adequate substitute for pleading with specificity that assets moved from SR Capital to the HWP account were Robert's and thus would have been available to satisfy the judgment if not for the defendants' actions in concealing them.

*Chen v. Berenjian* (2019) 33 Cal.App.5th 811, on which plaintiff relies, is of little assistance to plaintiff. In *Chen*, the plaintiff obtained two judgments against the debtor, Shazad, who entered into an agreement with his brother, Sharmad, that Sharmad would file a lawsuit against Shazad, Shazad would allow a default judgment to be taken against him, and Sharmad would obtain title to or a lien against all of Shazad's assets in order to create a shield against the plaintiff and other creditors.

(*Id.* at p. 815.) The plaintiff alleged that Sharmad made no genuine effort to enforce the judgment or obtain assets from Shazad in satisfaction of the judgment. (*Id.* at p. 816.) However, when plaintiff attempted to enforce the judgment against Shazad, Sharmad would levy on the property to defeat plaintiff's efforts. (*Ibid.*) For example, Sharmad levied on stereo speakers that Shazad had sold to the plaintiff and which were the basis of plaintiff's lawsuit against Shazad to defeat plaintiff's claim. (*Ibid.*) Shazad also transferred other assets to Sharmad without reasonable consideration to conceal them from the plaintiff. (*Ibid.*) The primary issue in *Chen* was whether the litigation privilege barred the plaintiff's claim under the UVTA (*id.* at pp. 817–822), which has no bearing here. The court also held that the trial court had erred in sustaining the demurrer on grounds of uncertainty because plaintiff alleged that the speakers belonged to the business owned by Shazad, which was not a named defendant. (*Id.* at p. 822.) The Court of Appeal concluded that the complaint had adequately alleged that the speakers were owned by Shazad. (*Ibid.*)

Thus, the sole uncertainty identified by the trial court in *Chen* was not whether a fraudulent transfer by the debtor had been alleged, but whether the speakers belonged to Shazad or his business. Unlike here, the complaint in *Chen* alleged multiple transfers from Shazad to his brother that were intended to frustrate the plaintiff's attempts to enforce his judgment against Shazad and identified specific assets involved in those transfers. Nothing in the opinion indicates that, where a transfer from an individual *to* a debtor is alleged to be neither a gift nor a bona fide loan, the plaintiff has adequately alleged an earlier fraudulent transfer from the debtor to that individual.

Plaintiff contends that it may be relieved of the obligation to plead fraud with particularity if facts supporting the claim lie more within the defendant's knowledge than plaintiff's. However, as the SR defendants point out, plaintiff did not argue that this exception applied below and has therefore waived this argument. (See *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3 ["It is axiomatic that arguments not asserted below are waived and will not be considered for the first time on appeal"].) Even if plaintiff had not forfeited this contention, the cases plaintiff relies on recognize that " '[l]ess specificity is required when "it appears from the nature of the allegations that the defendant must necessarily possess full information concerning the facts of the controversy," ' " which, for example, can relieve the plaintiff of pleading the names of employees who made misrepresentations. (*Miles v. Deutsche Bank National Trust Co.* (2015) 236 Cal.App.4th 394, 403.) Plaintiff does not cite any cases supporting that it may carry its burden of pleading a cause of action sounding in fraud without alleging *any* facts supporting that fraud took place and merely alleging the result of the purported fraud—i.e., that the funds transferred by SR Capital to the HWP account consisted of Robert's money.

### 2.2.2. The SAC fails to allege that there was any underlying fraud if the money was not Robert's prior to the defendants' acts.

The SAC alleges that, even if the money transferred by SR Capital to the HWP account was not initially Robert's, it became his because it was held exclusively in the account for his use and benefit. However, even if that is the case, it is unclear how the transfer of the funds from SR Capital to the HWP account delayed, hindered, or defrauded creditors.

24

Although we "treat[] the demurrer as admitting all material facts properly pleaded," we do not "assume the truth of contentions, deductions or conclusions of law." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967.) Thus, we are not required to accept the conclusion that, even if Robert had no right to this money beforehand, "[b]ut for the Money Laundering Scheme, the money in the HWP account would have been subject to execution levy using traditional methods of judgment enforcement." Rather, taking the facts alleged as true, plaintiff could not levy on funds held by the SR defendants. If the HWP defendants used the funds transferred to that account for purposes other than paying for Robert's expenses, plaintiff could not claim that those funds belonged to Robert, since the SAC alleges that the account was controlled by the HWP defendants. In other words, if the money was not Robert's before the defendants' actions, the only way money deposited in the HWP account could arguably be available to satisfy the judgment against him is *because* the SR defendants made the transfers and the HWP defendants agreed to use the account to cover Robert's personal expenses.

The SAC does not explain how the SR defendants' acts, which created a new source of funds allegedly belonging to Robert, rather than concealing funds already belonging to him, hindered, delayed, or defrauded plaintiff. Plaintiff does not identify a single case where a transfer made *to* a judgment debtor or funding an account to cover the debtor's personal expenses was held to be sufficient to plead fraud or a conspiracy to defraud against the transferor.

Assuming for the sake of argument that the SR defendants acted with fraudulent intent, the SAC fails to allege how

25

defendants' actions injured plaintiff if the money was not Robert's before it was transferred to the HWP account. If the alleged damages would have resulted even in the absence of the fraud, " 'causation *cannot* be alleged and a fraud cause of action cannot be sustained.' [Citation.]" (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1499; see also *Berger v. Varum* (2019) 35 Cal.App.5th 1013, 1020 [to plead common law fraudulent transfer, " ' "[m]ere intent to delay or defraud is not sufficient; injury to the creditor must be shown affirmatively . . . [and] prejudice to the plaintiff is essential" ' "].) The SAC alleges that "[p]laintiff has been damaged by . . . not being able to apply the money placed in the HWP account from time to time in satisfaction of the judgment." However, this theory of damages presumes that the money was Robert's, and thus available to satisfy the judgment before it was moved to the HWP account. Plaintiff was also required to allege how the defendants' acts resulted in harm to plaintiff that it would not have otherwise suffered even if the money was not Robert's in the first place.

Plaintiff has failed to do so. "A well-established principle of the law of fraudulent transfers is . . . [that] '[i]t cannot be said that a creditor has been injured unless the transfer puts beyond [its] reach property [it] otherwise would be able to subject to the payment of [the] debt.' [Citations.]" (*Mehrtash v. Mehrtash* (2001) 93 Cal.App.4th 75, 80.)[5] Plaintiff does not allege any facts supporting that the money SR Capital transferred to the HWP

---

[5] Although *Mehrtash v. Mehrtash*, *supra*, 93 Cal.App.4th 75 was an action brought under the UVTA, the principles set forth in such cases are instructive when considering a common law claim premised on a fraudulent transfer. (See *Berger v. Varum*, *supra*, 35 Cal.App.5th at p. 1020.)

account would otherwise have been available to satisfy the judgment. Shlomo is not the judgment debtor, and the SAC does not allege that Robert has any ownership or member interest in SR Capital. Thus, plaintiff would not be in any better position to obtain satisfaction of the judgment if the alleged bad acts had not taken place.

*Rice v. Downs* (2021) 73 Cal.App.5th 213 (*Rice*) does not assist plaintiff. In that case, the debtor, Rice, was the founder and sole managing member of Triton Community Development LLC (Triton). (*Id.* at p. 219.) Downs was Rice's attorney and, after their relationship deteriorated, Downs obtained an arbitration award against Rice for hundreds of thousands of dollars in attorney fees and costs. (*Id.* at pp. 218–219.) Judgment was entered and the court granted Downs's motion for a charging order directing various limited liability companies of which Rice was a member, including Triton, to pay any distributions to which Rice was entitled directly to Downs until the judgment was satisfied. (*Id.* at p. 220.)

Rice filed for Chapter 11 bankruptcy and disclosed that, after the charging order was entered, Triton had paid Glaser Weil Fink Howard Avchen & Shapiro, LLC (Glaser Weil), the firm that represented him in his action against Downs, $450,000. (*Rice, supra*, 73 Cal.App.5th at p. 220.) Downs argued that this transfer violated the charging order and argued that the trial court should order this payment disgorged from Glaser Weil. (*Ibid.*) Rice contended that months before Downs moved for the charging order, Triton had entered into an agreement with Glaser Weil under which Triton became a co-obligor on Rice's debt to the law firm and that the payment to Glaser Weil was not a distribution to Rice subject to the charging order, but rather "a

27

payment made by Triton to satisfy its own debt" as co-obligor on Rice's debt. (*Id.* at pp. 220–221.) Rice also argued that "Glaser Weil had a 'perfected security interest in those funds which was senior to Downs'[s] lien arising from the charging order' " because he had granted Glaser Weil a security interest in his membership in Triton, which Glaser Weil had perfected. (*Id.* at p. 221.) The trial court granted the enforcement motion and, when Rice stated he could not pay, agreed with Downs's suggestion that it should be disgorged from Glaser Weil. (*Id.* at p. 223.) The court later issued its written order, in which it concluded that Triton was an alter ego of Rice and amended the charging order to make Triton equally liable jointly and severally liable for the sums owed to Downs. (*Id.* at p. 224.) It further held that the payment to Glaser Weil was improper and " 'a windfall in light of a valid order from this Court that the monies should have been used to satisfy that charging order[,]' " and ordered Glaser Weil to pay Downs $450,000. (*Id.* at p. 225.) Glaser Weil appealed. (*Ibid.*)

On appeal, the court rejected the argument that the $450,000 payment was not a distribution subject to the charging order. (*Rice, supra,* 73 Cal.App.5th at p. 225.) The court concluded that "it is clear that had Rice disbursed the $450,000 to himself to pay his legal bills, that disbursement would constitute a distribution;" that "Rice acknowledged in his declaration that he was 'the founder and sole Managing Member' of Triton"; and that "[t]his evidence supports the trial court's finding that . . . Rice had full control over Triton's distributions." (*Id.* at p. 227.) Further, "[e]ven if Triton made the payment pursuant to its own contractual obligation to Glaser Weil . . . the payment was 'pursuant to the obligation [Triton] had undertaken to Glaser Weil,' referring to the agreement 'under which Triton became a

28

co-obligor with [Rice] for past and future fees charged by the firm[,]' " which "establishe[d] that Triton paid not because Glaser Weil provided services to Triton, but because Triton had agreed to become 'co-obligor' on Rice's obligation." (*Ibid.*) "Thus, although Triton may have been paying for the obligation it had assumed, the result was that Rice personally was relieved of a portion of his debt." (*Id.* at pp. 227–228.) Further, Glaser Weil failed to challenge the trial court's conclusion that Triton was Rice's alter ego. "The fact that as a technical matter it was Triton that made the payment pursuant to its own purported obligations was immaterial because Triton and Rice were effectively one and the same." (*Id.* at p. 228.) The court nevertheless concluded that Glaser Weil's perfected security interest had priority over the charging order. (*Id.* at p. 229.)

*Rice* did not address whether Rice or Triton were liable for a fraudulent transfer. Whether a payment made by a company totally owned and controlled by a judgment debtor was a distribution subject to a charging order has little relevance here, where the SAC alleges that the SR defendants used money within *their* control to fund an account to pay the debtor's personal expenses. Nor are we concerned with whether the HWP account can be reached by Robert's creditors because the payments made by the HWP defendants on Robert's behalf "effectively [were] money in [Robert's] pocket." (*Rice*, *supra*, 73 Cal.App.5th at p. 228.)[6] The sole issue before us is whether the

---

[6] It appears from the record that a court has already held that the HWP account "constitutes property in which [Robert] has an interest and shall be applied in satisfaction of the Judgment" against him.

allegations, if accepted as true, support that the SR defendants conspired to defraud plaintiff.

We hold that plaintiff has failed to meet its burden of pleading fraud, and thus has necessarily failed to allege a conspiracy to commit fraud against the SR defendants. Thus, the demurrer was properly sustained.

## 3. The court did not abuse its discretion in denying plaintiff leave to amend its complaint a third time.

Having concluded that the trial court did not err in sustaining the demurrer, we consider whether the plaintiff has demonstrated that the defects in the SAC may be cured by amendment, such that the denial of leave to amend was an abuse of discretion.

Plaintiff identifies both new facts and new causes of action that it contends satisfy its burden of demonstrating that amendment would not be futile. "Contrary to long-standing rules generally precluding a party from changing the theory of the case on appeal [citations], a plaintiff may propose new facts or theories to show the complaint can be amended to state a cause of action, thereby showing the trial court 'abused its discretion' [citation] in not granting leave to amend." (*Connerly v. State of California* (2014) 229 Cal.App.4th 457, 460.) "The plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' [Citations.]" (*Ibid.*)

We conclude that the new legal theories and facts on which plaintiff relies do not remedy the defects of the SAC.

### 3.1. Plaintiff fails to identify any new facts supporting that it could adequately plead a cause of action against defendants.

In arguing that it can allege facts supporting a cause of action against the SR defendants, plaintiff relies on documents attached to its motion to file a third amended complaint, which it concedes was mooted by its appeal. Nevertheless, we may consider these facts in determining whether plaintiff could cure the defects in the SAC.

Plaintiff identifies 10 checks drawn from the HWP account, which indicate on their face that they were for Robert's benefit. However, as the SR defendants point out, the amounts, dates, and recipients of these checks were all alleged in the SAC.[7] These facts are not new, nor do they assist plaintiff in pleading that the money in the HWP account belonged to Robert before it was deposited there, or that plaintiff was injured by the SR defendants' act of transferring money to the HWP account for Robert's benefit.

Plaintiff further claims that sworn testimony Shlomo gave in 2019 supports the alleged money laundering scheme. The testimony indicates that Shlomo paid bills on Robert's behalf and paid money to the HWP account, facts already alleged in the SAC. The testimony does not support that Shlomo assisted in a scheme to keep money that belonged to Robert out of the reach of

---

[7] The SAC alleges that a check in the amount of $700 was signed by Marlene Savage and tendered to Facey Medical Foundation for Robert's benefit on May 4, 2020. Plaintiff's opening brief includes a check image to the same recipient on the same date indicating that the amount paid was $57.90.

Robert's creditors. Similarly, plaintiff cites testimony given by Robert at a postjudgment examination which establishes that: Savage worked for Robert, handling "paperwork, technical matters, things like that"; Robert did not believe that Savage paid his mortgage; and Robert did not know whether his mortgage was paid in December 2019 or January 2020. Plaintiff fails to explain how this testimony assists it in pleading a conspiracy to defraud or any other cause of action against the SR defendants.

Plaintiff also relies on a document showing that the HWP account was not in Robert's name, but in Treitel's. However, the SAC already alleges that the HWP account was opened by Treitel and Savage, not by Robert. This fact is neither new nor of assistance in remedying the deficiencies in the SAC.

Finally, plaintiff cites a judgment entered in an action brought against Banner Bank, Robert, and various LLCs, in which the court held that "[t]he express purpose of Defendant Banner Bank Account Nos. 58406003828 [the HWP account] and 58406006076 was to hold money in which Defendant Robert Rechnitz had an interest beyond the reach of his creditors." As to all defendants but Banner Bank, the judgment was by default. The action in question did not name the SR defendants as parties and the mere fact that judgment was entered does not establish that plaintiff has or could adequately allege that the SR defendants engaged in a conspiracy to defraud plaintiff.[8]

---

[8] Plaintiff suggests that the judgment has collateral estoppel effect as to the SR defendants. The SR defendants correctly contend that the doctrine of collateral estoppel only applies if "the party against whom the plea is asserted was a party, or in privity with a party, to the previous suit." (*Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986)

In sum, none of the facts identified indicate that plaintiff could cure the deficiencies of the SAC with respect to the SR defendants.

### 3.2. Plaintiff fails to demonstrate the possible viability of any new causes of action.

Plaintiff contends that the second through fourth causes of action advanced in the SAC were not new causes of action but "new theories of liability based on the same common nucleus of facts," and that the court should therefore have granted plaintiff leave to amend the complaint to plead them. To satisfy its burden of proving there is a reasonable possibility of amendment, plaintiff was required to "clearly and specifically set forth the 'applicable substantive law' [citation] and the legal basis for amendment, i.e., the elements of the cause of action and authority for it. Further, plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action." (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.) "Where the appellant offers no allegations to support the possibility of amendment and no legal authority showing the viability of new causes of action, there is no basis for finding the trial court abused its discretion when it sustained the demurrer without leave to amend." (*Id.* at p. 44.)

Plaintiff fails to explain the requirements for pleading the additional causes of action (or theories of liability) identified in the SAC, nor does it identify " 'specific facts showing the complaint can be amended to state' " them. (*Roe v. Hesperia*

---

41 Cal.3d 903, 910.) Plaintiff advances no facts or arguments supporting that the SR defendants were in privity with any party to the action in which the judgment was entered.

33

*Unified School District* (2022) 85 Cal.App.5th 13, 24.) Plaintiff merely asserts that a reasonable trier of fact could find defendants liable for damages and that plaintiff therefore "has available theories of liability" under the UVTA, a creditor's suit in aid of enforcement of judgment, quia timet, and accounting. This was not sufficient to carry plaintiff's burden.

Although Plaintiff makes a more robust attempt at arguing that it could maintain a RICO cause of action against the SR defendants, it nevertheless fails to establish a reasonable possibility that this cause of action remedies the defects in the SAC.

The elements of a civil RICO claim are: " '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as "predicate acts") (5) causing injury to the plaintiff's "business or property." ' [Citation.]" (*Living Designs, Inc. v. E.I. Dupont de Nemours and Co.* (9th Cir. 2005) 431 F.3d 353, 361.) " ' "[R]acketeering activity" is any act indictable under several provisions of Title 18 of the United States Code, and includes the predicate acts of mail fraud, wire fraud and obstruction of justice.' [Citation.]" (*Sanford v. MemberWorks, Inc.* (9th Cir. 2010) 625 F.3d 550, 557.) "A fraud claim under both federal and state law requires (1) a representation or failure to disclose a material fact, (2) falsity, (3) knowledge of falsity, (4) intent to deceive, (5) reliance, and (6) damage arising from the reliance. [Citations.] Mail and wire fraud requires an additional element— 'the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension.' [Citation.]" (*Globe Internat., Inc. v. Superior Court* (1992) 9 Cal.App.4th 393, 399.) Like common law fraud under California law, mail and wire fraud under RICO must be pleaded with

particularity, including "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." (*Moore v. Kayport Package Exp., Inc.* (9th Cir. 1989) 885 F.2d 531, 541.)

Plaintiff contends that the SR defendants have engaged in wire fraud, relying on the same allegations we have held fail to allege fraud with specificity in arguing that it states a cause of action for RICO. Presenting the same allegations under a new title does not remedy the fundamental deficiencies previously identified.

Plaintiff quotes *Smagin v. Yegiazaryan* (9th Cir. 2022) 37 F.4th 562 (*Smagin*) at great length and asserts that the conduct alleged with respect to the defendants is comparable to the acts of the defendants in that case. Plaintiff's reliance is misplaced. In *Smagin*, the defendant and others used a series of fraudulent transactions to steal the plaintiff's shares in a joint real estate investment in Russia, and the defendant was indicted by Russian authorities but fled to California. (*Id.* at pp. 564–565.) The plaintiff obtained an arbitration award in London and a California district court judge confirmed the award, entered judgment against the defendant and entered a temporary protective order freezing the defendant's assets. (*Id.* at p. 565.) The protective order specifically referenced assets that the defendant might receive in a pending arbitration proceeding. (*Ibid.*) The defendant ultimately settled the arbitration for $168 million and the plaintiff alleged that, in order to avoid paying the judgment, " 'create[d] a web of offshore entities and a complex ownership structure to secret the [arbitration] settlement proceeds and avoid [the district] court's reach.' " (*Ibid.*) Many of the alleged components of this scheme took place outside the

United States,[9] but the plaintiff also alleged numerous RICO activities involving domestic entities and property in the United States. (*Ibid.*) The district court dismissed the complaint on the grounds that the plaintiff failed to plead a domestic injury. (*Id.* at p. 566.) Thus, the only issue before the Ninth Circuit in that case was "whether the alleged injuries to a judgment obtained by Plaintiff from a United States district court in California are domestic injuries such that Plaintiff has statutory standing under RICO." (*Id.* at p. 564.) It concluded that the judgment existed as property in California and that the plaintiff's injuries were domestic. (*Id.* at p. 567.)

Even if the court in *Smagin* had found the allegations in that case sufficient to plead fraud for purposes of RICO (a question that was not before it), we see little similarity between the facts there and those present here. The plaintiff in *Smagin* alleged that he had a judgment against the defendant, who created various foreign entities to keep money that could be used to satisfy the judgment out of the plaintiff's hands. Here, the judgment debtor, Robert, is not alleged to have done anything beyond agreeing to the SR defendants' and HWP defendants' acts. In support of the RICO cause of action, plaintiff continues to rely on the bald assertion that Robert had an interest in money

---

[9] "For example, [the] plaintiff [in *Smagin*] allege[d] that [defendant] received the [arbitration award] through his attorneys in London; established a trust in Lichtenstein to hold proceeds from the [arbitration award] ('the Alpha Trust'); purchased a business incorporated in Nevis to create additional layers of complexity; established a bank account in Monaco with Defendant CMB Bank for that Nevis corporation; and then moved the funds from the Alpha Trust to that bank account." (*Smagin, supra*, 37 F.4th at p. 565.)

transferred by SR Capital to the HWP account but fails to argue any facts that would permit us to conclude that is the case. Plaintiff therefore fails to carry its burden of establishing a reasonable possibility that it could state a RICO claim against the SR defendants.

## 4. We decline to remand the matter with instructions to correct the judgment.

Finally, plaintiff contends that, if the judgment is affirmed, we should remand the matter with instructions to correct the judgment of dismissal. Plaintiff contends that the purported use of "etc." in the judgment is erroneous and suggests that the action is dismissed as to Robert and the HWP defendants.[10]

"The court may, upon motion of the injured party, or its own motion, correct clerical mistakes in its judgment or orders as entered, so as to conform to the judgment or order directed . . . ." (Code Civ. Proc., § 473, subd. (d).) "The test which distinguishes clerical error from possible judicial error is simply whether the challenged portion of the judgment was entered inadvertently (which is clerical error) versus advertently (which might be judicial error, but is not clerical error)." (*Tokio Marine & Fire Ins. Corp. v. Western Pacific Roofing Corp.* (1999) 75 Cal.App.4th 110, 117; *Burch v. CertainTeed Corporation* (2019) 34 Cal.App.5th 341, 346 ["[a] clerical error results when the order or judgment misstates the court's actual intent"].) "Section 473 is addressed to

---

[10] The judgment of dismissal does not include the term "etc.", as plaintiff states (without citation to the record), but orders the action dismissed with prejudice as to "SR Capital LLC, et al." However, the court's minute order sustaining the demurrer was clear that the court was dismissing the action as to the SR defendants only.

37

the sound discretion of the trial court and the trial court's order will not be disturbed absent a showing of clear abuse of discretion. [Citation.] Whether the error was clerical in nature is a matter for the trial court to determine." (*Conservatorship of Tobias* (1989) 208 Cal.App.3d 1031, 1035.)

The record before us does not indicate that plaintiff raised this issue with the trial court, which has "the authority and the power to correct" clerical errors even "after a judgment or decree has become final." (*In re Estate of Goldberg* (1938) 10 Cal.2d 709, 714.) Plaintiff fails to identify any authority supporting that this court may correct a clerical error in a judgment when no motion was made to the trial court under Code of Civil Procedure section 473, subdivision (d). We therefore decline to remand with directions to correct the judgment.

## DISPOSITION

The judgment is affirmed. Shlomo and SR Capital shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, Acting P.J.

WE CONCUR:

EGERTON, J.

HEIDEL, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.